**EXHIBIT A**

STOCK PURCHASE AGREEMENT

AMONG

THE OCEANAIRE, INC.

AND

THE DEBTOR SUBSIDIARIES OF THE OCEANAIRE, INC.,

AND

LANDRY'S RESTAURANTS, INC. AND

LSRI HOLDINGS, INC.

February __, 2010

# TABLE OF CONTENTS

§1.  Definitions .................................................................................................................................. 2

§2.  Purchase and Sale of Reorganized Shares. ........................................................................... 4
    (a)  Basic Transaction ..................................................................................... 4
    (b)  Purchase Price ........................................................................................... 4
    (c)  Earnest Money Deposit ............................................................................ 4
    (d)  Closing ....................................................................................................... 4
    (e)  Deliveries at Closing ................................................................................ 4

§3.  Representations and Warranties ............................................................................................ 5
    (a)  Debtors' Representations and Warranties ............................................. 5
    (b)  Investor's Representations and Warranties ........................................... 6

§4.  Pre-Closing Covenants ........................................................................................................... 7
    (a)  General ........................................................................................................ 7
    (b)  Operation of Business ............................................................................... 8

§5.  Post-Closing Covenants ......................................................................................................... 8
    (a)  General ........................................................................................................ 8
    (b)  Assumed Contracts ................................................................................... 8
    (c)  Employment ............................................................................................... 8

§6.  Conditions to Obligation to Close ......................................................................................... 9
    (a)  Conditions to Investor's Obligation ....................................................... 9
    (b)  Conditions to the Company's Obligation .............................................. 9

§7.  Risk of Loss .......................................................................................................................... 10

§8.  Termination ........................................................................................................................... 10
    (a)  Termination of Agreement ..................................................................... 10
    (b)  Effect of Termination .............................................................................. 10

§9.  Miscellaneous. ...................................................................................................................... 11
    (a)  Press Releases and Public Announcements ......................................... 11
    (b)  Third-Party Beneficiaries ....................................................................... 11
    (c)  Entire Agreement .................................................................................... 11
    (d)  Succession and Assignment ................................................................... 11
    (e)  Counterparts ............................................................................................ 11
    (f)  Headings ................................................................................................... 11
    (g)  Notices ...................................................................................................... 11
    (h)  Governing Law ......................................................................................... 12
    (i)  Amendments and Waivers ..................................................................... 12
    (j)  Severability .............................................................................................. 12
    (k)  Expenses ................................................................................................... 13
    (l)  Construction ............................................................................................. 13
    (m)  Incorporation of Exhibits and Annexes ............................................... 13

(n)     No Exclusivity ................................................................................................... 13
(o)     Jurisdiction ......................................................................................................... 13

Exhibit A—    Plan of Reorganization
Exhibit B—    Escrow Agreement
Exhibit C—    Rejected Contracts
Exhibit D—    Contract Assumed Amounts
Annex I—      Exceptions to the Company's Representations and Warranties
Annex II—     Exceptions to Investor's Representations and Warranties

This Stock Purchase Agreement (this "*Agreement*") is entered into as of February ___, 2010, by and among Landry's Restaurants, Inc. and LSRI Holdings, Inc. (collectively "*Investor*")**,** and The Oceanaire, Inc. (the "*Company*"), and the debtor subsidiaries of The Oceanaire, Inc. set forth on the signature pages hereto (together with the Company, each a "*Debtor*" and collectively, the "*Debtors*"). Investor and the Debtors are each referred to as a "Party" and collectively as the "*Parties.*"

## RECITALS

WHEREAS, the Debtors are debtors and debtors in possession under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (as amended, the "*Bankruptcy Code*"), having each commenced voluntary bankruptcy cases (jointly administered under the case number 09-34264-11) (together with all legal proceedings instituted in the Bankruptcy Court in connection with the Restructuring (as defined below) or otherwise involving the Debtors, collectively, the "*Bankruptcy Case*") on July 5, 2009 (the "*Petition Date*") in the United States Bankruptcy Court for the Northern District of Texas (the "*Bankruptcy Court*");

WHEREAS, subject to the terms and conditions hereof, the Debtors and the Official Committee of Unsecured Creditors of the Debtors (the "*Committee*") have filed with the Bankruptcy Court a plan of reorganization substantially in the form of the attached Exhibit A supported and approved by Investor (the "*Plan*") for the Committee and the Debtors to implement the restructuring transactions contemplated thereby and to pursue approval of this Agreement and the confirmation of the Plan, including but not limited to cancellation of all of the equity outstanding in the Company (the "*Restructuring*");

WHEREAS, in connection with the confirmation of the Plan and the Restructuring, if approved, all of the issued and outstanding shares of capital stock in the Company will be cancelled;

WHEREAS, the Debtors desire to consummate and have approved, subject solely to approval of this Agreement and the confirmation of the Plan by the Bankruptcy Court and the Plan becoming effective, the Restructuring, including the transactions contemplated hereby, including the sale of all of the common stock to be issued under and as described in the Plan (the "*Reorganized Shares*") in the reorganized Company as described in the Plan (the "*Reorganized Oceanaire*"), which shares shall be non-transferable unless exempt under the Securities Act (as defined below) and subject to appropriate legends; and

WHEREAS, in connection with the Plan and the Restructuring, Investor desires to purchase the Reorganized Shares and to consummate the transactions contemplated by this Agreement, upon the terms and conditions provided for herein and in the Plan.

WHEREAS, concurrently herewith, Investor is executing the Escrow Agreement in the form attached hereto as Exhibit B and making the Deposit with the Escrow Agent;

NOW, THEREFORE, in consideration of the premises and the mutual promises herein made, and in consideration of the representations, warranties, and covenants herein contained

and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree as follows:

§1.     *Definitions.*

"*Affiliate*" has the meaning set forth in Rule 12b-2 of the regulations promulgated under the Securities Exchange Act.

"*Agreement Approval Order*" has the meaning set forth in §6(a) below.

"*Bankruptcy Case*" has the meaning set forth in the recitals above.

"*Bankruptcy Code*" has the meaning set forth in the recitals above.

"*Bankruptcy Court*" has the meaning set forth in the recitals above.

"*Bid Procedures Order*" has the meaning set forth in § 6(a) below.

"*Business Day*" means any day not designated as a legal holiday by Bankruptcy Rule 9006(a) and any day on which commercial banks are open for business and not authorized, by law or executive order, to close in the City of Dallas, Texas.

"*Closing*" has the meaning set forth in §2(d) below.

"*Closing Date*" has the meaning set forth in §2(d) below.

"*Confirmation Order*" has the meaning set forth in §6(a) below.

"*Contract Assumed Amounts*" has the meaning set forth in §5(b) below.

"*Debtor*" and "*Debtors*" have the meanings set forth in the preface above.

"*Deposit*" has the meaning set forth in §2(c) below.

"*Escrow Agent*" has the meaning set forth in §2(c) below.

"*Escrow Agreement*" has the meaning set forth in §2(c) below and shall provide that the Deposit shall be made within two (2) Business Days of the execution and delivery of this Agreement and that (i) if the Plan is approved and the transaction closes, then the Deposit (together with all interest earned thereon) will be credited to the Purchase Price, (ii) if the Plan does not include Investor as the "Equity Sponsor" in the Bid Procedures Order, the Agreement Approval Order and in the Confirmation Order and the Closing shall not have occurred on or before April 15, 2010, for a reason other than due to acts or omissions of Investor, then the Deposit (together with all interest earned thereon) will be returned to Investor, (iii) if the Bankruptcy Court shall have issued an order, decree or ruling or taken any other action restraining, enjoining or otherwise prohibiting the transactions provided for in this Agreement, then the Deposit (together with all interest earned thereon) will be returned to Investor, and (iv) in all other instances, the Deposit (together with all interest earned thereon) reverts to the Debtor.

"*Final Order*" means an order or judgment of the Bankruptcy Court or other court of competent jurisdiction the operation or effect of which is not stayed, and (i) as to which order or judgment (or any revision, modification or amendment thereof), the time to appeal or seek review or rehearing has expired, and as to which no appeal or petition for review or motion or other proceeding for rehearing or reargument has been taken or has been made and is pending for argument or (ii) as to which any appeal or petition for review or motion or other proceeding for rehearing or reargument shall have been finally determined or dismissed and the time to take any further appeal or seek review or rehearing has expired and no further appeal, review or rehearing petition, motion or proceeding has been filed.

"*Investor*" has the meaning set forth in the preface above.

"*IRS Code*" means the Internal Revenue Code of 1986, as amended.

"*Lien*" means (a) any mortgage, pledge, lien, encumbrance, charge, or other security interest, (b) purchase money liens and liens securing rental payments under capital lease arrangements, and (c) other liens arising in the Ordinary Course of Business and not incurred in connection with the borrowing of money.

"*Ordinary Course of Business*" means the ordinary course of business consistent with past custom and practice (including with respect to quantity and frequency).

"*Parties*" and "*Party*" have the meanings set forth in the preface above.

"*Person*" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization, any other business entity or a governmental entity (or any department, agency, or political subdivision thereof).

"*Petition Date*" has the meaning set forth in the recitals above.

"*Plan*" has the meaning set forth in the recitals above, and all exhibits attached thereto, and any amendments, modifications and supplements .

"*Purchase Price*" has the meaning set forth in §2(b) below.

"*Reorganized Oceanaire*" has the meaning set forth in the recitals above.

"*Reorganized Shares*" has the meaning set forth in the recitals above.

"*Restructuring*" has the meaning set forth in the recitals above.

"*Securities Act*" means the Securities Act of 1933, as amended.

"*Securities Exchange Act*" means the Securities Exchange Act of 1934, as amended.

"*Tax*" or "*Taxes*" means any federal, state, local, or foreign income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits,

environmental (including taxes under IRS Code §59A), customs duties, capital stock, franchise, profits, withholding, social security (or similar), unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever, including any interest, penalty, or addition thereto, whether disputed or not.

"*Tax Return*" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

§2.     *Purchase and Sale of Reorganized Shares.*

(a)     *Basic Transaction.* On and subject to the terms and conditions of this Agreement, Investor agrees to purchase from the Company, and the Company agrees to sell to Investor, all of its Reorganized Shares for the consideration specified below in this §2.

(b)     *Purchase Price*. Investor agrees to provide or cause to be provided for the full and complete payment of secured claims of the Debtors' pre-petition bank lenders pursuant to the Plan and to pay in cash, pursuant to the Plan, $6.6 million cash (the "*Purchase Price*").  Investor shall additionally provide for the complete satisfaction of the Contract Assumed Amounts (as defined below), if any.  There shall be no set offs or other reductions to the Purchase Price for any reason.  If the Plan is approved by way of a Confirmation Order and the transaction closes, then the Deposit and any interest earned thereon will be credited to the Purchase Price.

(c)     *Earnest Money Deposit*. Within two (2) Business Days of the execution and delivery of this Agreement, Investor will deliver to an escrow agent satisfactory to Investor and the Committee, which is a financial institution regularly engaged in the provision of escrow services (the "*Escrow Agent*") that is a party to an escrow agreement in form and substance satisfactory to the Investor and the Committee (the "*Escrow Agreement*") a $1.5 million earnest money deposit (the "*Deposit*"), which will be held in escrow for the benefit of the Debtors to secure the obligations of Investor hereunder in accordance with the provisions of the Escrow Agreement executed by Investor, the Escrow Agent and the Company.

(d)     *Closing*.  The closing of the transactions contemplated by this Agreement (the "*Closing*") shall take place at the offices of Munsch Hardt Kopf & Harr, P.C. 3800 Lincoln Plaza 500 N. Akard Street Dallas, Texas 75201-6659 following the satisfaction or waiver of all conditions to the obligations of the Parties to consummate the transactions contemplated hereby (other than conditions with respect to actions the respective Parties will take at the Closing itself), in no event later than one Business Day after the Confirmation Order becomes effective or such other date and place as Investor, Committee and the Company may mutually determine (the "*Closing Date*").

(e)     *Deliveries at Closing*. At the Closing, the Company will deliver to Investor stock certificates, if any, representing all of its Reorganized Shares, endorsed in blank or accompanied by duly executed assignment documents, and Investor will deliver to the Company the Purchase Price in accordance with previously delivered instructions and the Plan.  The Purchase Price may be paid in part from the release to the Company of the Deposit (together with any interest earned

thereon) made pursuant to §2(c). At the Closing, the Company and the Debtors shall make distributions in accordance with the Plan and the Confirmation Order.

§3.    *Representations and Warranties.*

(a)    *Debtors' Representations and Warranties.* The Company represents and warrants to Investor that the statements contained in this §3(a) are correct and complete in all material respects as of the date of this Agreement and will be correct and complete in all material respects as of the Closing Date (as though made then and as though the Closing Date were substituted for the date of this Agreement throughout this §3(a)), except as set forth in Annex I attached hereto and shall be unaffected by any investigation heretofore or hereafter made.

(i)    *Organization of The Company.* The Company is duly organized, validly existing, and in good standing under the laws of the jurisdiction of its incorporation.

(ii)    *Authorization of Transaction.* Subject to approval of this Agreement by the Bankruptcy Court and confirmation of the Plan, the Company has full power and authority (including full corporate or other entity power and authority) to execute and deliver this Agreement and to perform its obligations hereunder. Subject to the foregoing required approvals, this Agreement constitutes the valid and legally binding obligation of the Company, enforceable in accordance with its terms and conditions subject to applicable bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and other similar laws effecting creditor rights and remedies generally and the general principles of equity, including good faith and fair dealing. Other than approval from the Bankruptcy Court and related notices under the Bankruptcy Code and applicable rules, the Company need not give any notice to, make any filing with, or obtain any authorization, consent, or approval of any government or governmental agency in order to consummate the transactions contemplated by this Agreement. The execution, delivery and performance of this Agreement and all other agreements contemplated hereby have been duly authorized by the Company (subject to the approval of the Bankruptcy Court).

(iii)    *Non-contravention.* Subject to approval of this Agreement by the Bankruptcy Court and confirmation of the Plan and related notices, neither the execution and delivery of this Agreement, nor the consummation of the transactions contemplated hereby, will (A) violate any constitution, statute, regulation, rule, injunction, judgment, order, decree, ruling, charge, or other restriction of any government, governmental agency or court to which the Company is subject or any provision of its charter, bylaws, or other governing documents, (B) conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify, or cancel, or require any notice under any agreement, contract, lease, license, instrument, or other arrangement to which the Company is a party or by which it is bound or to which any of its assets is subject, or (C) result in the imposition or creation of a Lien upon or with respect to Reorganized Shares.

(iv)    *Brokers' Fees.* The Company has no liability or obligation to pay any fees or commissions to any broker, finder or sales agent with respect to the transactions contemplated by this Agreement.

(v) *Disclaimer of Other Representations and Warranties.* Except as expressly set forth in this §3(a), the Company makes no representation or warranty, express or implied, at law or in equity, in respect of the Company, the other Debtors, Reorganized Oceanaire, its or their respective Affiliates, or any of its or their respective financial projected performance, assets, prospects, liabilities or operations, including with respect to merchantability or fitness for any particular purpose, and any such other representations or warranties are hereby expressly disclaimed. Investor hereby acknowledges and agrees that, except to the extent specifically set forth in §3(a), Investor is purchasing the Reorganized Shares on an "as-is, where-is" basis.

(b) *Investor's Representations and Warranties.* Investor represents and warrants to the Company that the statements contained in this §3(b) are correct and complete in all material respects as of the date of this Agreement and will be correct and complete in all material respects as of the Closing Date (as though made then and as though the Closing Date were substituted for the date of this Agreement throughout this §3(b)), except as set forth in Annex II attached hereto and shall be unaffected by any investigation heretofore or hereafter made.

(i) *Organization of Investor.* Investor is a corporation (or other entity) duly organized, validly existing, and in good standing under the laws of the jurisdiction of its incorporation (or other formation).

(ii) *Authorization of Transaction.* Investor has full power and authority (including full corporate or other entity power and authority) to execute and deliver this Agreement and to perform its obligations hereunder. This Agreement constitutes the valid and legally binding obligation of Investor, enforceable in accordance with its terms and conditions subject to applicable bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and other similar laws effecting creditor rights and remedies generally and the general principles of equity, including good faith and fair dealing. Investor need not give any notice to, make any filing with, or obtain any authorization, consent, or approval of any government or governmental agency in order to consummate the transactions contemplated by this Agreement. The execution, delivery and performance of this Agreement and all other agreements contemplated hereby have been duly authorized by Investor.

(iii) *Non-contravention.* Neither the execution and delivery of this Agreement, nor the consummation of the transactions contemplated hereby, will (A) violate any constitution, statute, regulation, rule, injunction, judgment, order, decree, ruling, charge, or other restriction of any government, governmental agency, or court to which Investor is subject or any provision of its charter, bylaws, or other governing documents or (B) conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify, or cancel, or require any notice under any agreement, contract, lease, license, instrument, or other arrangement to which Investor is a party or by which it is bound or to which any of its assets is subject.

(iv) *Brokers' Fees.* Investor has no liability or obligation to pay any fees or commissions to any broker, finder or sales agent with respect to the transactions contemplated by this Agreement.

6

(v)     *Investment.* Investor is not acquiring the Reorganized Shares with a view to or for sale in connection with any distribution thereof within the meaning of the Securities Act or any applicable state securities laws.  Investor is an "accredited investor" as such term is defined in Rule 501(a) promulgated under the Securities Act.  Investor can bear the risk of its investment in the Reorganized Shares for an indefinite period of time and is aware that the transfer of the Reorganized Shares may not be possible because they have not been registered under the Securities Act or any applicable state securities laws and therefore cannot be sold unless subsequently registered under the Securities Act and any applicable state securities laws or an exemption from such registration is available.

(vi)     *Financial Resources*.  Investor has the financial resources immediately available without restriction (including, without limitation, without any conditions precedent, contingencies or any further action or inaction by Investor or any of its Affiliates) to perform its obligations hereunder and contemplated hereby (including, without limitation, (x) payment of the Purchase Price at Closing and (y) payment of any other amounts post-Closing hereunder, including the Contract Assumed Amounts) and has provided the Company with correct and complete evidence thereof.

(vii)     *No Further Due Diligence*.  Investor has completed its financial, legal and other due diligence in connection with the transactions contemplated by this Agreement (including, without limitation, all of its due diligence with respect to the Debtors and their respective Affiliates) and no further due diligence is required in connection with this Agreement or the transactions contemplated hereby (including, without limitation, performance of Investor's post-Closing obligations specified in §5 below). Investor further acknowledges and represents that it has had the opportunity to inspect the books and records of the Debtors and the public filing records in the Case and otherwise and enters into this Agreement after it own independent investigation of the facts and circumstances relating to the assets, liabilities, projected performance, prospects, operations and financial condition of the Debtors and the transactions contemplated herein and under the Plan.  For the avoidance of doubt, Investor shall be entitled to receive any and all written due diligence provided to any other entity pursuant to the Bid Procedures Order.

None of the representations and warranties contained in §3(a) above shall survive the Closing; all others shall survive.

§4.     *Pre-Closing Covenants.* The Parties agree as follows with respect to the period between the execution of this Agreement and the Closing.

(a)     *General.* Each of the Parties will use its reasonable best efforts to take all actions and to do all things necessary, proper or advisable in order to consummate and make effective the transactions contemplated by this Agreement and the Plan (including satisfaction, but not waiver, of the Closing conditions set forth in §6 below), subject, in the case of the Debtors, their duties and obligations under the Bankruptcy Code.  Without limiting the generality of the foregoing, if the Bid Procedures Order, the Agreement Approval Order or the Confirmation Order (as respectively defined below), or any other orders of the Bankruptcy Court relating to

this Agreement, shall be appealed by any Person (or a petition for certiorari or motion, for review or rehearing shall be filed with respect thereto), each Party hereto agrees to use its reasonable best efforts to obtain an expedited resolution of such appeal, petition, motion or other proceeding.

(b) *Operation of Business.* Debtors will not engage in any practice, take any action, or enter into any transaction outside the Ordinary Course of Business, except as approved by the Bankruptcy Court and with notice to the Investor.

§5. *Post-Closing Covenants.* The Parties agree as follows with respect to the period following the Closing:

(a) *General.* In case at any time after the Closing any further action is necessary or desirable to carry out the purposes of this Agreement, each of the Parties will take such further action (including the execution and delivery of such further instruments and documents) as any other Party reasonably may request, all at the sole cost and expense of the requesting Party.

(b) *Assumed Contracts.* Investor shall and shall cause the Debtors to take all necessary actions to assume the executory contracts and unexpired leases on the Closing Date, except for those already rejected as listed on the attached <u>Exhibit C</u>.

(c) *Employment*

(i) Prior to the Closing, Investor shall or shall cause the Debtors to deliver, in writing, an offer of employment to each of the employees who remain employed immediately prior to the Closing by any of the Debtors to commence immediately following the Closing; provided that any offer of employment shall be contingent on the Closing actually occurring. Each such offer of employment shall be at the same salary or hourly wage rate and position in effect immediately prior to the Closing. Such individuals who accept such offer by the Closing Date are hereinafter referred to as the "*Transferred Employees.*"

(ii) Investor shall or shall cause the Debtors to provide for a period of one (1) year following the Closing Date or such longer period of time required by applicable law to each of the Transferred Employees who remains an employee, compensation (including salary, wages and opportunities for commissions, overtime and premium pay) and for the period until such relevant plan expires in accordance with its terms, employee benefits that are substantially equivalent in scope and cost to the employees as to those provided to the Transferred Employees immediately prior to the Closing.

(iii) For purposes of eligibility, vesting and for calculating of severance and vacation benefits (but not for benefit accrual purposes generally) under the employee benefit plans of Investor or Debtors providing benefits to Transferred Employees (other than any equity-based plans or nonqualified deferred compensation plans or arrangements) (the "Investor Plans"), Investor shall or shall cause the Debtors to credit each Transferred Employee with his or her years of service with Debtors and any predecessor entities, to the same extent as such Transferred Employee was entitled immediately prior to the Closing to credit for such service under any similar plan.

Notwithstanding the foregoing, nothing herein shall be construed to require crediting of service that would result in a duplication of benefits.

(iv)     Investor shall or shall cause the Debtors to provide Transferred Employees with uninterrupted benefits coverage as of the Closing Date with respect to group medical benefits and long term disability insurance.  The Investor Plans which are health benefit plans shall not deny Transferred Employees coverage on the basis of pre-existing conditions in the plan year in which the Closing occurs to the extent the pre-existing condition exclusions were waived or satisfied under an analogous plan as of the Closing Date and shall credit, to the extent commercially practicable, such Transferred Employees for any deductibles and out-of-pocket expenses ;paid in the calendar year of initial participation in the Investor Plans in the plan year in which the Closing occurs.

(v)     Except as required by applicable law, Investor shall be responsible for all liabilities with respect to Transferred Employees attributable to their (i) accrued and unpaid salary or wages as of the Closing Date, and (ii) accrued and unused vacation, sick days and personal days through the Closing Date.  The Investor shall or shall cause the Debtors to continue the Debtors' vacation policy in effect as of the date hereof from the Closing Date to the end of the calendar year in which the Closing Date occurs.

(vi)     Each Transferred Employee whose employment terminates prior to the first anniversary of the Closing Date shall be entitled to receive severance benefits, if any, upon the same terms and in the same amount as would be payable as set forth on <u>Exhibit D</u>.

(vii)     Without limiting the generality of the foregoing, Investor shall assume and be responsible for obligations listed on <u>Exhibit D</u>, all such obligation under this §5 shall be the "*Contract Assumed Amounts*."

§6.     *Conditions to Obligation to Close.*

(a)     *Conditions to Investor's Obligation.* Investor's obligation to consummate the transactions to be performed by it in connection with the Closing and post-Closing is subject to satisfaction of the following condition:

(i)     the Bankruptcy Court shall have approved the bid procedures and "stalking horse" protections (including the breakup fee) (the "*Bid Procedures Order*"), this Agreement (the "*Agreement Approval Order*") and confirmed the Plan pursuant to Section 1129 of the Bankruptcy Code (the "*Confirmation Order*"), and each such order shall not be subject to a stay.

Investor may waive this condition if it executes a writing so stating at or prior to the Closing.

(b)     *Conditions to the Company's Obligation.* The Company's obligation to consummate the transactions to be performed by them in connection with the Closing is subject to satisfaction of the following condition:

(i)     the Bankruptcy Court shall have entered the Bid Procedures Order, the Agreement Approval Order and the Confirmation Order, and each such order shall not be subject to a stay.

The Company may waive this condition if they execute a writing so stating at or prior to the Closing.

§7.     *Risk of Loss.*  The risk of loss, damage and destruction to the Debtors or any of their respective assets shall be borne solely by Investor from the date hereof until the Closing Date, subject to insurance proceeds of any of the Debtors, if any.

§8.     *Termination.*

(a)     *Termination of Agreement.* The Parties may terminate this Agreement as provided below:

(i)     Investor and the Company may terminate this Agreement by mutual written consent at any time prior to the Closing;

(ii)     Investor or the Company may terminate this Agreement if the Bankruptcy Court shall have issued an order, decree, ruling or taken any other action restraining, enjoining or otherwise prohibiting the transactions completed hereby and such order, decree, ruling or other action shall become a Final Order;

(iii)     Investor may terminate this Agreement by giving written notice to the Company at any time prior to the Closing if (A) Investor is not the "Equity Sponsor" specified in the Bid Procedures Order, the Agreement Approval Order and the Confirmation Order or (B) the Closing shall not have occurred on or before April 15, 2010, if the Closing shall not have occurred for a reason other than due to the acts or omissions of Investor; i.e. if Investor causes the Closing not to occur, it shall have no right to terminate this Agreement; and

(iv)     the Company may terminate this Agreement by giving written notice to Investor at any time prior to the Closing (A) in the event Investor has breached any representation, warranty, or covenant contained in this Agreement, or (B) if the Closing shall not have occurred on or before April 15, 2010, if the Closing shall not have occurred for a reason other than due to the acts or omissions of the Company (i.e. if the Company causes the Closing not to occur, it shall have no right to terminate this Agreement), subject to the Company's obligations under the Bankruptcy Code and applicable rules.

(b)     *Effect of Termination.* Subject to the provisions below, if any Party terminates this Agreement pursuant to §8(a)(i) above, all rights and obligations of the Parties hereunder shall terminate without any liability of any Party to any other Party and the Deposit (together with all interest earned thereon) shall be paid to the party so designated in such mutual written consent; *provided, however,* that if Investor properly terminates this Agreement under §8(a)(ii) or §8(a)(iii) or if the Company properly terminates this Agreement under §8(a)(ii), the Deposit (together with all interest earned thereon) shall be returned to the Investor, which shall be

Investor's sole and complete remedy under this Agreement or otherwise; *provided*, *further*, that Investor shall continue to have all rights and remedies provided to it in the Bid Procedures Order. In all other circumstances, the Deposit (together with all interest earned thereon) shall revert to the Company and the Company shall have any and all other additional rights and remedies available to it in law or at equity. Investor acknowledges and agrees that it has no right to specific performance, injunctive, and/or other equitable relief hereunder or under any agreement, document or instrument entered into in connection herewith.

§9.    *Miscellaneous.*

(a)    *Press Releases and Public Announcements.* No Party shall issue any press release or make any public announcement relating to the subject matter of this Agreement without the prior written approval of Investor and the Company; *provided, however,* that any Party may make any public disclosure it believes in good faith is required by applicable law or any listing or trading agreement concerning its publicly traded securities (in which case the disclosing Party will use its best efforts to advise the other Parties prior to making the disclosure) and the Debtors may make disclosures and give notices as required by the Bankruptcy Code and applicable rules.

(b)    *Third-Party Beneficiaries.* This Agreement shall confer rights and remedies to those parties to executive contracts and the employees of the Company in accordance with §5(b) and §5(c) of this Agreement.

(c)    *Entire Agreement.* This Agreement (including the documents referred to herein) and the confidentiality agreement signed by the parties, if any, constitutes the entire agreement among the Parties and supersedes any prior understandings, agreements, or representations by or among the Parties, written or oral, to the extent they relate in any way to the subject matter hereof.

(d)    *Succession and Assignment.* This Agreement shall be binding upon and inure to the benefit of the Parties named herein and their respective successors and permitted assigns. No Party may assign either this Agreement or any of its rights, interests or obligations hereunder without the prior written approval of Investor and the Company.

(e)    *Counterparts.* This Agreement may be executed in one or more counterparts (including by means of facsimile or other electronic transmission) each of which shall be deemed an original but all of which together will constitute one and the same instrument.

(f)    *Headings.* The section headings contained in this Agreement are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.

(g)    *Notices.* All notices, requests, demands, claims, and other communications hereunder shall be in writing. Any notice, request, demand, claim, or other communication hereunder shall be deemed duly given (i) when delivered personally to the recipient or (ii) one business day after being sent to the recipient by reputable overnight courier service (charges prepaid), as set forth below:

| *If to the Company/Debtors:* | *Copy to:* |
|---|---|
| The Oceanaire, Inc. | Duane Morris LLP |
| 1300 Nicollet Mall, #2200 | 190 South LaSalle Street, Suite 3700 |
| Minneapolis, Minnesota 55403 | Chicago, Illinois 60603 |
| Attention:  Chief Executive Officer | Attention:     John Robert Weiss, Esq. |
| | David J. Kaufman, Esq. |

| *If to Investor:* | *Copy to:* |
|---|---|
| Landry's Restaurants, Inc. | Andrews Kurth LLP |
| 1510 West Loop South | 600 Travis Street, Suite 4200 |
| Houston, Texas 77027 | Houston, Texas  77002 |
| Attention:   Steven L. Scheinthal, Esq. | Attention:  Jeffrey E. Spiers, Esq. |

| *If to Committee:* | *Copy to:* |
|---|---|
| _____ | Munsch Hardt Kopf & Harr, P.C. |
| _____ | 3800 Lincoln Plaza |
| _____ | 500 N. Akard Street |
| | Dallas, Texas 75201-6659 |
| | Attention:  Joe Marshall, Esq. |

Any Party may change the address to which notices, requests, demands, claims, and other communications hereunder are to be delivered by giving the other Parties notice in the manner herein set forth.

(h)     *Governing Law*. This Agreement shall be governed by and construed in accordance with the domestic laws of the State of Texas without giving effect to any choice or conflict of law provision or rule (whether of the State of Texas or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Texas.

(i)     *Amendments and Waivers.* No amendment of any provision of this Agreement shall be valid unless the same shall be in writing and signed by Investor and the Company.  No waiver by any Party of any provision of this Agreement or any default, misrepresentation, or breach of warranty or covenant hereunder, whether intentional or not, shall be valid unless the same shall be in writing and signed by the Party making such waiver, nor shall such waiver be deemed to extend to any prior or subsequent default, misrepresentation, or breach of warranty or covenant hereunder or affect in any way any rights arising by virtue of any prior or subsequent such occurrence.

(j)     *Severability.* Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.

(k) *Expenses.* Investor and the Company will bear its own costs and expenses (including legal fees and expenses) incurred in connection with this Agreement and the transactions contemplated hereby; *provided, however,* all transfer, documentary, sales, use, stamp, registration and other such Taxes, and all conveyance fees, recording charges and other fees and charges (including any penalties and interest), if any, required to be paid in connection with the consummation of the transactions contemplated by this Agreement shall be paid by Investor when due, and Investor shall, at its own expense, file all necessary Tax Returns and other documentation with respect to all such Taxes, fees and charges, and, if required by applicable law, the Parties will, and will cause their Affiliates to, join in the execution of any such Tax Returns and other documentation and *provided, further*, that nothing in this Agreement shall affect the rights of Investor under the Bid Procedures Order.

(l) *Construction.* Each Party has had the opportunity to review and revise this Agreement and consult with counsel. The Parties have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement. Any reference to any federal, state, local, or foreign statute or law shall be deemed also to refer to all rules and regulations promulgated thereunder, unless the context requires otherwise. The word "including" shall mean including without limitation. If there is a conflict between the Plan and this Agreement, the terms and conditions of this Agreement shall control. If there is a conflict between this Agreement and the Confirmation Order, the terms and conditions of the Confirmation Order shall control.

(m) *Incorporation of Exhibits and Annexes.* The Exhibits and Annexes identified in this Agreement are incorporated herein by reference and made a part hereof.

(n) *No Exclusivity.* Notwithstanding any other provision of this Agreement, Debtors shall have the right to solicit, initiate, advertise or encourage the submission of any proposal or offer from any Person relating to the acquisition of all or substantially all of the capital stock or assets of Reorganized Oceanaire or any of its Subsidiaries or the Reorganized Shares (including any acquisition structured as a merger, consolidation or share exchange). Investor acknowledges that this Agreement may be subject to overbid or competitive bids in connection with the Bankruptcy Case. Any and all such activities by the Debtors or such bids, proposals or offers shall be subject to the terms of the Bid Procedures Order.

(o) *Jurisdiction.* The Debtors and Investor irrevocably submit to the exclusive jurisdiction of the United States Bankruptcy Court for the Northern District of Texas, Dallas Division, for the purpose of any action or proceeding arising out of or relating to this Agreement and the Debtors and Investor hereby irrevocably agree that all claims in respect to such action or proceeding shall be heard and determined in such court. The Debtors and Investor agree that a Final Order in any action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

*****

HOU:2992433.5

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the date first above written.

**INVESTOR:**

**LANDRY'S RESTAURANTS, INC.**

By _____
    Name: _____
    Title: _____

**LSRI HOLDINGS, INC.**

By _____
    Name: _____
    Title: _____

**DEBTORS:**

**THE OCEANAIRE TEXAS RESTAURANT COMPANY, L.P.**

By: _____
Name: Glenn C. Massey
Title:  Chief Financial Officer, Secretary and
       Treasurer of The Oceanaire Restaurant
       Company, Inc., the General Partner of The
       Oceanaire Texas Restaurant Company, L.P.

**THE OCEANAIRE, INC.**

By: _____
Name: Glenn C. Massey
Title:  Chief Financial Officer, Secretary and
       Treasurer

**THE OCEANAIRE RESTAURANT COMPANY, INC.**

By: _____
Name:  Glenn C. Massey
Title:    Chief Financial Officer, Secretary and
            Treasurer


**THE OCEANAIRE MINNEAPOLIS RESTAURANT COMPANY, LLC**

By: _____
Name:  Glenn C. Massey
Title:    President and Chief Executive Officer


**THE OCEANAIRE INVESTMENT COMPANY, INC.**

By: _____
Name:  Glenn C. Massey
Title:    Chief Financial Officer, Secretary and
            Treasurer


**THE OCEANAIRE TEXAS BEVERAGE COMPANY, INC.**

By: _____
Name:  Glenn C. Massey
Title:    Director

HOU:2992433.5

## **Exhibit A – Plan of Reorganization**

(see attached)

## **Exhibit B – Escrow Agreement**

(see attached)

HOU:2992433.5

### Exhibit C – Rejected Contracts

1. Lease between The Oceanaire Restaurant Company, Inc. ("ORC") and 1700 Seventh L.P. dated as of March 19, 2001 (Seattle).

2. Lease between ORC and St. James Associates Joint Venture dated as of December 7, 2004 (Philadelphia).

3. Lease between ORC and Piedmont Row Drive, LLC (as successor to Crescent Resources, LLC) dated as of October 24, 2005 (Charlotte).

4. Lease between ORC and Biltmore Shopping Center Partners LLC dated as of January 10, 2007 (Phoenix).

5. Lease between ORC and 580 Investors LLC dated as of March 6, 2007 (Cincinnati).

| Contract Counterparty | Contract Type | Location |
|---|---|---|
| T Mobile<br>T Mobile Bankruptcy Team<br>PO Box 53410<br>Bellevue, WA 98015 | Cellular and Telecommunications Agreement | The Oceanaire Restaurant Company, Inc. |
| AT&T Capital Services, Inc.<br>13160 Collections Center Dr.,<br>Chicago, IL 60693 | Firewall Equipment Leases | The Oceanaire Restaurant Company, Inc. |
| AB Window Cleaning<br>PO Box 81143<br>Seattle, WA 98108 | Window washing | Seattle |
| ADT<br>PO Box 371956<br>Pittsburgh, PA 15250 | Alarm monitoring | Seattle |
| Allied Waste<br>3000 E Hedley St<br>Philadelphia, PA 19137 | Garbage removal | Philadelphia |
| Alsco<br>PO Box 668088<br>Charlotte, NC 28266 | Linen | Charlotte |
| America's Best<br>18405 Aurora Ave N #H31<br>Seattle, WA 98133 | Janitorial | Seattle |
| Atlantic<br>529 E Thompson St<br>Philadelphia, PA 19125 | Refrigeration maintenance | Philadelphia |
| Brink's<br>5575 NW 87th Ave<br>Miami, FL 33178 | Armored car | Philadelphia |

Exhibit C - 1

| Contract Counterparty | Contract Type | Location |
|---|---|---|
| Brink's<br>5575 NW 87th Ave<br>Miami, FL 33178 | Armored car | Charlotte |
| Brink's<br>5575 NW 87th Ave<br>Miami, FL 33178 | Armored car | Cincinnati |
| City of Charlotte Aviation Department<br>PO Box 35622<br>Charlotte, NC 28235 | Digital advertising | Charlotte |
| Comcast<br>PO Box 97002<br>Lynwood, PA 98046 | Cable | Seattle |
| Coordinated Business Systems<br>851 W 128th St<br>Burnsville, MN 55337 | Printer | Cincinnati |
| Darling International<br>PO Box 552210<br>Detroit, MI 48255 | Grease trap maintenance | Seattle |
| DeBra Kuempel<br>3976 Southern Ave<br>Cincinnati, OH 45227 | HVAC, refrig & grease trap maintenance | Cincinnati |
| Do Downtown<br>318 Greenup St 2nd Fl<br>Covington, KY 41011 | Online advertising | Cincinnati |
| Dunbar<br>PO Box 64115<br>Baltimore, MD 21264 | Armored car | Seattle |
| Earth BioTech<br>50 Rices Mill Rd<br>Glenside, PA 19038 | Grease trap maintenance | Philadelphia |
| Encore<br>425 N 85th St<br>Seattle, WA 98103 | Print advertising | Seattle |
| Financial Information Technologies, Inc.<br>7702 Woodland Center Blvd #50<br>Tampa, FL 33614 | EFT services | Seattle |
| Financial Information Technologies, Inc.<br>7702 Woodland Center Blvd #50<br>Tampa, FL 33614 | EFT services | Charlotte |

Exhibit C - 2

HOU:2992433.5

| Contract Counterparty | Contract Type | Location |
|---|---|---|
| Financial Information Technologies, Inc. 7702 Woodland Center Blvd #50 Tampa, FL 33614 | EFT services | Cincinnati |
| General Emergency Monitoring 3643 N Meridian St Indianapolis, IN 46208 | Alarm monitoring | Cincinnati |
| Hubbard and Cravens 1114 E 52nd St Indianapolis, IN 46205 | Coffee | Seattle |
| Hubbard and Cravens 1114 E 52nd St Indianapolis, IN 46205 | Coffee | Philadelphia |
| Hubbard and Cravens 1114 E 52nd St Indianapolis, IN 46205 | Coffee | Cincinnati |
| Ikon Office Solutions 2740 American Blvd W Bloomington, MN 55431 | Printer | Seattle |
| Ikon Office Solutions 2740 American Blvd W Bloomington, MN 55431 | Printer | Philadelphia |
| Ikon Office Solutions 2740 American Blvd W Bloomington, MN 55431 | Printer | Charlotte |
| Imperial Parking 1700 7th Ave #106 Seattle, WA 98101 | Parking | Seattle |
| Integrated Technology PO Box 78594 Charlotte, NC 28271 | Alarm monitoring | Charlotte |
| Joines HVAC and Refrigeration PO Box 1798 Indian Trail, NC 28079 | HVAC & refrigeration maintenance | Charlotte |
| Linens of the Week 735 Lamont St NW Washington, DC 20010 | Linen | Philadelphia |
| Morgan Linen 817 Webster St Dayton, OH 45404 | Linen | Cincinnati |

Exhibit C - 3

HOU:2992433.5

| Contract Counterparty | Contract Type | Location |
|---|---|---|
| Nelbud<br>PO Box 271<br>Egg Harbor City, NJ 08215 | Hood cleaning | Philadelphia |
| Optima Services, Inc.<br>4100 Executive Park Dr #2<br>Cincinnati, OH 45241 | Janitorial | Cincinnati |
| Orkin<br>25400 74th Ave S<br>Kent, WA 98032 | Pest elimination | Seattle |
| Park America, Inc.<br>1 Bala Ave #500<br>Bala Cynwyd, PA 19004 | Valet | Philadelphia |
| Parking Solutions of NC, Inc.<br>1415 S Church St Ste T<br>Charlotte, NC 28203 | Valet | Charlotte |
| Philadelphia Detection Systems, Inc.<br>5319 Oxford Ave<br>Philadelphia, PA 19124 | Alarm monitoring | Philadelphia |
| Philadelphia Extract<br>PO Box 2957<br>Philadelphia, PA 19141 | $CO_2$ | Philadelphia |
| Philadelphia Gas Works<br>PO Box 3500<br>Philadelphia, PA 19122 | Natural gas servicer | Philadelphia |
| Prosource<br>4720 Glendale Milford Rd<br>Cincinnati, OH 45242 | Copier usage | Cincinnati |
| Public Storage<br>4329 S Blvd<br>Charlotte, NC 28209 | Storage | Charlotte |
| Qwest<br>PO Box 91155<br>Seattle, WA 98111 | Phone | Seattle |
| R&T Hood and Duct<br>6100 12th Ave S<br>Seattle, WA 98101 | Hood cleaning | Seattle |
| Redi<br>4453 Aurora Ave N<br>Seattle, WA 98103 | Pest elimination | Seattle |
| Royal Cup<br>PO Box 170971<br>Birmingham, AL 35217 | Coffee | Charlotte |

Exhibit C - 4

| Contract Counterparty | Contract Type | Location |
|---|---|---|
| RTI<br>3711 Kennebec Dr #100<br>Eagan, MN 55122 | Grease Reclamation | Seattle, Philadelphia, Cincinnati |
| Scanlon Associates<br>3901 Chichester Ave<br>Boothwyn, PA 19061 | HVAC maintenance | Philadelphia |
| Seattle City Valet<br>PO Box 16748<br>Seattle, WA 98116 | Valet | Seattle |
| Seattle Convention and Visitor's Bureau<br>701 Pike St #800<br>Seattle, WA 98101 | Community advertising | Seattle |
| Service Solutions<br>890 Redina Terrace<br>Cincinnati, OH 45215 | Steamer maintenance | Cincinnati |
| Steritech<br>7600 Little Ave<br>Charlotte, NC 28226 | Pest Elimination | Charlotte |
| Stillwater Commercial Services<br>1986 Anderson Ferry Rd<br>Cincinnati, OH 45238 | Exhaust cleaning | Cincinnati |
| Stratus Building Solutions<br>810 Tyvola Rd #136<br>Charlotte, NC 28217 | Janitorial | Charlotte |
| System Parking, Inc.<br>111 E Wacker Dr #1407<br>Chicago, IL 90601 | Valet | Cincinnati |
| Terminix<br>4455 Salzman Rd<br>Middletown, OH 45044 | Pest elimination | Cincinnati |
| The Plant Trolley, Inc.<br>PO Box 58669<br>Cincinnati, OH 45258 | Plants | Cincinnati |
| Time Warner Cable<br>3268 Highland Ave<br>Cincinnati, OH 45213 | Cable | Cincinnati |
| Tomlinson Linen Service<br>2902 S 12th St<br>Tacoma, WA 98405 | Linen | Seattle |

Exhibit C - 5

HOU:2992433.5

| **Contract Counterparty** | **Contract Type** | **Location** |
|---|---|---|
| US Bank Office Equipment Finance Svcs<br>1310 Madrid St #101<br>Marshall, MN 56258 | Printer/copier rental | Cincinnati |
| Verizon<br>PO Box 660748<br>Dallas, TX 75266 | Internet DSL | Philadelphia |
| XO Communications<br>8851 Sandy Pkwy<br>Sandy, UT 84070 | Phone and long distance | Philadelphia |
| Ambius<br>PO Box 95409<br>Palatine, IL 60095 | Plants | Houston |
| Blue Leaf<br>4405 SW 74th Ave<br>Miami, FL 33155 | Dining Room Chair Supplier | National |
| CareerBuilder LLC<br>c/o Transworld Advertising<br>3684 N Wickham Rd Ste C<br>Melbourne, FL 32935 | Job postings | National |
| DMX, Inc.<br>PO Box 660557<br>Dallas, TX 75266-0557 | Satellite music | National |
| Luxury Media Group/Denver Magazine<br>1610 Wynkoop St #400<br>Denver, CO 80202 | Print advertising | Denver |
| Morris Visitor Publications/Where Magazine<br>PO Box 933574<br>Atlanta, GA 31193 | Print advertising | Washington, DC |

| **Location** | **Vendor** | **Equipment** | **Serial No.** | **Lease/Contract ID Number** |
|---|---|---|---|---|
| Indianapolis | IKON | Canon IR5570 | SLQ05121 | 16118A |
| Minneapolis-Corp (M Hudson) | IKON | HP5100 | CNBF2096163 | 218344 |
| Minneapolis | IKON | HP9055 | JPCJC00145 | 281344 |
| Minneapolis-Corp (Mailroom) | IKON | Canon IRC5180 | TND02949 | 2027052 |

Exhibit C - 6

## Exhibit D – Contract Assumed Amounts

| *No.* | *Obligation* | *Estimated Cure Amount* |
|---|---|---|
| 1. | Commodore Plan, balances shall be vested and paid in accordance with the Plan | [Redacted] |
| 2. | Amended and Restated Employment Agreement with Terence Ryan, dated as of December 31, 2008 (originally entered in 1999 amended in 2004). | [Redacted] |
| 3. | Amended and Restated Confidentiality , Non-Compete and Change in Control Agreement made with Wade W. Wiestling, dated as of December 31, 2008 (originally entered in 1999 amended in 2004). | [Redacted] |
| 4. | Amended and Restated Confidentiality, Non-Compete and Change in Control Agreement with Glenn C. Massey, dated as of December 31, 2008 (originally entered in 1999 amended in 2004). | [Redacted] |
| 5. | Severance benefits for Tim Whitlock and Hal Hecht consistent with those to be received by Wade Wiestling under his agreement | [Redacted]-TW [Redacted]-HH |
| 6. | Unless otherwise provided for under an agreement, other than this Agreement, any employee whose duties are "Materially Reduced or Negatively Altered," (as such term is defined in the Ryan Agreement above) or is terminated within one year of the Confirmation Order shall be granted severance equal to (a) for department heads, two weeks severance for each year of service, or such fraction thereof; and (b) for all other personnel, one weeks severance for each year of service or fraction thereof, plus any vacation time not otherwise taken, all applied consistently with past practice | [Redacted] |

## Annex I – Exceptions to the Company's Representations and Warranties

Certain liquor licenses may require local consent.

## **Annex II – Exceptions to Investor's Representations and Warranties**

None.